Good morning, my name is Peter Hosharyan, and I am going to deliver arguments on behalf of the petitioners in this matter. Petitioners challenge the Board of Immigration Appeals' conclusion that the beating and harassment that the petitioners suffered did not rise to the level of persecution, and that the petitioners did not meet their burden of showing well-founded fear of future persecution. Petitioner's credible and compelling testimony demonstrates that she has both suffered past persecution and has established a well-founded fear of future persecution. Petitioners were born in Grozny, Chechnya, and the persecution that they suffered was because of their identification by Russians as being Chechen nationals. What's the best evidence in the record that the harassment was based on ethnicity or another protective factor? Looking at it in the totality of the circumstances, it's well known that in the last couple of decades, the ongoing conflict between Chechen rebels and Russia has been one of the most bloodiest in the last couple of decades. And the petitioners lost their home. They were homeless. They were subjected to detention camps, and in those detention camps, they were harassed. They were beaten by Russian nationals because they were Chechens and they were Chechen camps. Am I reading the record correctly in that at the camp, there was only one physical attack and there were no serious injuries from that? Is that true? Well, the testimony by the petitioner, the fact that there was only one attack at the camp at that time, according to the testimony, is true. As far as the seriousness of it, she testified on page 169 of the administrative record, line 2. The question was, did they actually physically harm you? The answer was, they beat us. They threw our clothes. But I have to say that no major injuries like broken bones or anything, but they beat us pretty bad. I think the answer was just a qualification by the petitioner to show that she didn't need to be hospitalized or anything that was drastically serious in nature. But she testified that she was beaten, and in her declaration, she says that her clothes were ripped. So there was a possible attempted rape or some kind of physical abuse. Counsel Judge Gould, if I could interject a question, please. Yes, Your Honor. One of the things that bothered me about this incident as a basis for claiming past persecution was that my understanding was that the soldiers were doing a robbery, that they were trying to rob the people in the refugee camp of valuables. And so if that's what's involved, if they're trying to extract any currency or gold or jewelry, and they beat someone in the course of committing a crime, would that qualify as persecution? Thank you for the question, Your Honor. That alone would, in and of itself, if the facts were interpreted in that manner, possibly yes and possibly no. However, what distinguishes this is the fact that they were helpless in these detention camps. Their clothes were torn. They were beaten. It doesn't seem like to enact a robbery would require someone to go in and rip someone's clothes and beat them up. There's no evidence in the record that they resisted to the Russian soldiers robbing them, where they would have to be beaten up or their clothes ripped. Well, here's what the testimony says. I kind of share Judge Holt's questions. I'm on page 168. That when the Russian soldiers, drunken with the influence of narcotics, would show up and harass everybody around, women, children, they were looking for anything valuable, and they would mistreat young women, young girls. Did anything in particular happen to you or your family? Yes, one of these days they came to our camp. I was there with my daughter and my son as a juvenile. They started demanding valuables, money, then proceeded tearing off our clothes and beating us. And then the Red Cross intervenes. I mean, the question is, I guess, what's the basis in the record for concluding, except by implication, that this was a beating based on a protected ground, ethnicity or religion? Well, I believe that the entire reason, I mean, I wouldn't see any other reason that the Russians would want to harm them other than the fact that they can. And they are under their supposed control at those refugee camps, and they can come and harass them and beat them and do whatever they like to them, just for the mere fact that they're pushing their weight around. They are Chechen nationals, and because of the history of the conflict, it just, one thing leads to another. And I think it's logical to make that conclusion, that because they are Chechens in detention camps and are constantly being harassed by the people who are so-called supposed to be protecting them, just as a logical step, would lead me to conclude that they are being harassed and beaten because of their nationality. Counsel, another question I've got is, it's not exactly a detention camp. It's not like they're held in prison. It's a refugee camp, right, if their houses have been destroyed. So, like, I'm a little concerned with presidential implications of saying that whenever someone's in a refugee camp, that you have to view it as if they're being imprisoned by the government. Because you do have civil turmoil in some countries, and populations have to go to camps for safety. So, like, right now there's, like, a lot of Somali refugees in a refugee camp in Kenya. And wouldn't we view it like all of those Somalis are being detained, that they're, like, in prison in Kenya? Well, Your Honor, the testimony by the petitioners states that the refugee camps were some of the most horrific conditions. There were rats running around. There were people dying of disease and infection and hunger. It seems to me that they were not being protected by those who established those camps, and not only not being protected, but being harassed and beaten. Okay, thank you. I'll reserve. Very good. Thank you. We'll hear from the government. Thank you. May it please the Court, Ada Bosk on behalf of the Attorney General. Because the Charkins – sorry, the Charkins – I'm going to mispronounce the name as well. The Charkins failed to identify evidence that compels finding past persecution or a well-founded fear of future persecution. This Court should deny the petition for review. The petitioners were displaced. They – during the second war between Russia and the Chechnyans, they were placed in a – they went to a refugee camp. The – that in and of itself, however, is generally not sufficient to establish past persecution. It is fairly well settled that civil strife by itself is not enough. So accordingly, the Board properly looked to what specifically happened to these individuals. And the Court has already referenced the first incident, and that's where, according to Petitioner's testimony, drunken drug soldiers broke into her tent. And her testimony actually shows that the reason they broke into the camp was because they were looking for valuables. The Court has already referenced AR-168, but we would also refer the Court to AR-200, where she says they didn't take anything. They wanted to take, but actually there wasn't anything to take. That's why they started beating us, demanding valuables. They thought that we had some valuables that we were not willing to give them. So her testimony shows that the soldiers, and their conduct was certainly offensive, but not all offensive conduct rises to the level of persecution. And her testimony shows that this was not on account of a protected ground. We believe that they also, her testimony also shows that it doesn't rise to the level of persecution, because if you compare her experiences, this particular experience and her general experiences as a whole, they certainly don't rise to the level of persecution where, in comparison to other instances. There's a little light. Go ahead, Judge Gould. I was just going to say, how do you respond specifically to Petitioner's argument that they're in the camp because they're Chechens, and the camps are run by Russians, and the camps have horrific, not just unpleasant, but really terrible conditions for them? Well, I'm sorry. The record actually does not support the proposition that only Chechens were in these refugee camps. If you look at AR-278, I know that it's elsewhere, but the people that were displaced during the war were not simply Chechens. They were pretty much all ethnic Russians that lived in that region, all ethnic Armenians that lived in that region, as well as individuals of the Jewish faith. So the record doesn't show who exactly ran the camp. The testimony was that the Red Cross intervened when the soldiers broke into her tent, but there's no evidence one way or the other whether it was a camp that was established by the Russian government or whether it was a camp that was governed by the Red Cross. The testimony seemed to be that it was a Red Cross camp because one of the items that was suggested that she produced is some registration from the Red Cross. Are these kinds of camps, are they set up just by governments, or are they set up by non-governmental organizations or NGOs in some cases, if you know? I could say generally. I don't know that that's on the record, who established the camps. There is another – I'm sorry, I guess the answer is I don't know whether only governments set up refugee camps. I suspect that's not the case. I know, for example, in Haiti, the UN set up different camps, but that's – as I said, that's not on the record exactly. Yeah, the UN wasn't in. The – I can say that one of the articles that the petitioners provided is an article. It's at 414, and that talks about generally the camps and how individuals – there's dispute back and forth about the government wanting to close the camps and individuals that are currently residing in the camps do not wish to return to Chechnya. So there's a dispute back and forth as to whether the camps should remain open. So whether they were a government camp or a nonprofit organization camp, the record doesn't speak to. But what is pretty clear, we believe from the record, is that the reason these soldiers broke into her tent was because they believed that she had valuables. And the reason they beat her was because they suspected that she was withholding valuables and not turning them over to them. Is there any evidence in the record that the soldiers were demanding valuables from non-Chechens? There's nothing in the record that says they were targeting anyone. Her testimony seemed to be that they were doing this throughout the camp. I didn't see any distinction one way or the other on that. Right. I don't think there is. I think the only record as to who is in the camps is the State Department of Country reports that says – are being displaced, but Russians, Armenians, and those of the Jewish faith. Right. But we don't know anything. There's nothing in the record about the composition of this particular camp, is there? That's correct, Your Honor. Nothing compels one conclusion or the other. The other incident that Ms. Cherkins testified to was she was stopped when she moved to Moscow for documents. And, again, there, that testimony does not rise to the level of persecution. I mean, the Department of State country reports show that individuals who move within Russia must register, I think it's within seven days, and that the police do go out and check for documents. And when somebody does not have documents, they are harassed and oftentimes bribed. That kind of experience, though, doesn't rise to the high level of persecution. Beyond those two encounters, Ms. Cherkins only had a general fear, and not saying it's not well-founded. I mean, the region in itself, particularly then, was largely in transition. But that doesn't mean that she had suffered past persecution or that there's evidence that compels finding a well-founded fear of future persecution. Okay. Well, I was going to ask a question, but go ahead and finish. Her fear of future persecution was twofold, according to her. Before you leave the past persecution, I had a question about what the BIA decision actually meant. The BIA decision seems to say, and maybe you can correct me if you think my interpretation is wrong, there was no nexus as to the displacement. But the BIA seemed to rest its decision as to the camp in that the incident didn't rise to the level of persecution. Am I reading that correctly? Let me read you the sentences. Their displacement during the fighting in Chechnya was not linked to any protected ground. So that indicates to me that they're talking about the initial displacement into the refugee camp. Then the BIA says the beating and harassment they suffered during the incident at the refugee camp does not rise to the level of persecution. I take all that to mean that they're saying there's no nexus to the displacement, but they're not relying on nexus as to the incident in the camp. Are you reading that differently? I guess I had been, because I think I read the entire part. Because then it goes on to say, similarly, the discrimination they describe in other parts of Russia does not rise to the level of persecution. So the way I read the BIA decision was we should be focusing on whether or not that incident rose to the level of persecution rather than the fact that there may or may not have been a nexus, because the BIA didn't reach that issue. And I posit that, not because I'm just saying that's the way I read it. If you read it differently, then... Clearly, I had been. I don't know that that's – that Your Honor's reading is not a fair reading of it. And I think that's what we addressed in our brief, that the cases like – you compare her experiences to somebody like Gu, who was detained for three or four hours and beat with a rod ten times. That did not rise to the level of persecution. She relies on Ednew, for example, where the petitioner had been repeatedly raped and was severely beaten on account of her political opinion. Ms. Chokin's experiences, while unfortunate, certainly don't compare to the petitioner in Ednew or Korablina, which is the other case that they cite. Her experiences do seem more like the petitioner in Gu or even the petitioner in Molina Morales, where that individual was held at gunpoint and abducted for reporting a crime. I mean, if you look at simply whether the conduct being beaten up, being subjected to somebody trying to steal your valuables, whether that conduct rises to the level of persecution, the Board certainly recently found that it was more like conduct that this Court has found not to be persecution than the kind of extreme conduct that does rise to the level of persecution. So I have been reading it to be a finding of both, but if the Court is more comfortable with the one – It's not comfortable. It just changes the analysis. Then we have to focus on whether or not the incident rose to persecution rather than – as opposed to whether or not there's an axis. Right. Our questions are taking over time, but I want to make sure everybody had a chance to – Judge Thomas, I do have a question I'd like to ask counsel. Let me ask you to put on your broadest government perspective that for a moment. My question is, is this the kind of case where the government would profit or Cherokee would profit from having the use of our mediation facilities? And I raise that because we've been told and have received several memos from internal Justice Department memos that things are in flux, and they're reassessing which aliens should be sent out of the country, who should be removed, who not. It just struck me that Mrs. Cherokee didn't sound like John Dillinger. I didn't think she was going to be roaming around the U.S. robbing banks or dealing drugs. Is this the kind of case where while your department is looking into its standards, it would help to send it to mediation? I don't believe so, and I would want to clarify one thing. It is – the petitioner is certainly able to go to the Department of Homeland Security. They're the individuals that exercise prosecutorial discretion. So if they want to broach the DHS with regard to some deferral of removal, that certainly remains an option to them. But generally, there is no other relief available to the Cherokees. Some individuals may have marriages to U.S. citizens. She's not in that situation. Some may have been brought here as children. She's also not in that situation. So the kinds of things that at least the newspapers have reported on are as appropriate for the exercise of discretion. She doesn't meet any of those sort of red flags or criteria, although the use of the word criteria is probably wrong. She simply is an individual that came here, like many, seeking asylum, but her claims do not rise – did not rise to the level of past persecution. And her husband and son, at least according to her testimony, remain in Russia. So the – and that sort of undermines her claim of a well-founded fear of future persecution. So I just don't think that this is the kind of case where – well, again, it's DHS that exercises its prosecutorial discretion, but I don't believe this is the kind of case that would benefit from mediation. One final question, if you don't mind. The BIA faulted the petitioners for not providing documents, but this was a pre-real ID case, right? Correct. So how are we supposed to – it appeared to me that maybe they, because it had been remanded, they assumed it was post-real ID. Am I wrong on that? I don't – yes. I don't believe that they assumed that it was post-real ID. The Board generally, when it relates to the Real ID Act, specifically says that. I would say that, one, that the Board's decision on the merits stands in and of itself. The Board – No, they made that – they made that clear that they're making alternative finding. I just wanted your view on what – what – Well, I think the – what the Board did differently than the immigration judge, and the immigration judge might have run around a file of this Court's jurisdiction because he seemed to find the absence of documents concerning identity to be dispositive. The Board didn't do that. It reached the merits of her asylum claim and denied it on that basis. I would say even to come into this courtroom, I had to show an ID.  I told the security guard that I was from – my name is Ada Vosk, and I'm from New Jersey originally. They may have believed me, but they may not have let me into this building. But they wouldn't have thrown you out of the country. Excuse me? They wouldn't have thrown you out of the country. They – sure, maybe. The point is that the immigration judge's request, repeated request, and number of continuances was not unreasonable. I mean, that he – that she provided some documentation. I just wanted to clarify the real ID issue. Sure. I don't believe so, because they are fairly good about citing to the real ID app when it is directly applicable. Okay. Any further questions? Thank you. Thank you. And you have about a minute and a half or so for rebuttal. Thank you, Your Honor. All right. The State Department reports, country reports on Russia make it clear that Russians harass all – many ethnic minorities. So even if there were others other than Chechens in that camp, the Russians were harassing other minorities as well as Chechens. And I find it hard to believe that the Red Cross would set up a camp with such horrific conditions. So I would imagine it was a camp set up by Russians who neglected these ethnic nationals. Also, it should be brought to the Court's attention that the petitioner's husband was taken – separated from petitioner. He was beaten. He was interrogated, beaten. And the testimony shows that he came back to the camp and he was in a horrible state and severely beaten as well. And the case of this Court in Gordon Garcia v. INS stated that acts created – have created a pattern of persecution that's closely tied to the petitioner, this being her husband, who she has not had contact with in 10 years, who was beaten. And we do not know, actually, his whereabouts at this time. And with that, the petitioners have provided compelling testimony of past persecution. Also, well-founded fear of persecution far more than the 10 percent chance of actual persecution necessary to establish well-founded fear of future persecution. And with that, I rest. Thank you for your arguments. The case history will be submitted for decision.
judges: Thomas, Gould, Bybee